L.T. v C.C. (2024 NY Slip Op 50359(U))

[*1]

L.T. v C.C.

2024 NY Slip Op 50359(U)

Decided on April 3, 2024

Family Court, Erie County

Freedman, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 3, 2024
Family Court, Erie County

L.T., Petitioner,

against
C.C., Respondent.

Docket No. P-13833-22

L.T., Pro se
MICHAEL H. RANZENHOFER, ESQ.
Attorney for C.C.
CHERYL A. BERZER, ESQ.
Attorney for the Child, C. A. G. 

Brenda M. Freedman, J.

Petitioner, L. T. ["Mr. T."] filed a Petition to establish Paternity on December 29, 2022 against Respondent, C. C. ["Ms. C."] with respect to the child, C.A.G., born XX XX, 2017. Respondent moved to dismiss the Petition on the basis of Equitable Estoppel. By separate motion, the Attorney for the Child also moved to dismiss the Petition on the basis of Equitable Estoppel. Both Motions were granted to the extent that a Hearing was scheduled. The Hearing was held on December 1, 2023 and January 26, 2024. The Court heard from the following witnesses: Ms. P. B., Petitioner's mother; Mr. L. T., Petitioner, and C. C., Respondent-mother. A number of documents were introduced into evidence. An In camera was not held in this case.
Now, upon all the pleadings and proceedings held herein and upon the Court's unique opportunity to observe and evaluate each witness, to review the pertinent statutes and case law and apply it to the evidence adduced at the Hearing, I render the following Findings of Fact and Conclusions of Law, Decision and Order:
C.A.G. was born XX XX, 2017. Ms. C. is her natural mother. The parties stipulate that Mr. T. was present at C.A.G.'s birth.
An Order of Filiation was entered naming Mr. J.G. the father of C.A.G. dated August 28, 2019.
It is undisputed that the parties were together as a couple for approximately 10 years and have two other children together who are approximately 10 and 12 years old.
Ms. P. B., Petitioner's mother testified. Although she recalls the birth of C.A.G., and that it was at Buffalo General Hospital, she did not remember the birthdate. However, her son, Mr. T. [*2]showed her photographs of the birth. She has interacted with C.A.G. approximately 15 times, mainly at her home. At one point, Ms. C. had to be hospitalized and she arranged for Ms. B. to watch all of the children, including C.A.G., for approximately 1 week. Mr. T. was present and interacted well with C.A.G.. However, the last time she saw C.A.G. was approximately 2 years ago when she was 4 years old. While Ms. C. was pregnant and after the birth, Ms. B. had discussed with Ms. C. that Mr. T. was C.A.G.'s father and Ms. C. never denied it until the parties separated.
Mr. L.T. testified. The parties were in a relationship in 2017 when C.A.G. was conceived and born. Mr. T. testified the parties had sexual intercourse throughout their relationship including during the period of conception. Mr. T. gave conflicted testimony about when the parties broke up. First, he said they were together until August or September 2018, but later testified they broke up in 2017 after C.A.G.'s birth. Either way, they had been together for about 10 years and had 2 prior born children together. Mr. T. admitted they had a rocky relationship, breaking up numerous times. The last time they broke up, he moved out. Mr. G., who Ms. C. claims is C.A.G.'s father, did not "come into the picture" until 2018, a year after C.A.G. was born, according to Mr. T.
Mr. T. has had doubts about his parentage and has tried in the past to get a DNA test. Mr. T. testified that Ms. C. left Erie County twice making it impossible for him to serve her with his paternity petitions. He filed a paternity petition in March, 2018 which resulted in a dismissal. Although Mr. T. testified Ms. C. failed to appear, in fact, it was Mr. T. who failed to appear and the matter was dismissed as a result of his failure to prosecute. Mr. T. admits he did not file any paternity petitions in 2019, 2020 or 2021. He did file in 2022 and that matter was dismissed because he was ill and could not make it to court, Mr. T. testified.
Mr. T. refused to sign the Acknowledgement of Paternity because, he testified, he was not sure the baby was his.
On August 28, 2019, the day the Order of Filiation was entered naming Mr. G. father of C.A.G., Mr. T. was present in the Courthouse on a different matter and he saw Ms. C. and Mr. G. come out of a courtroom. He testified had not known of that court proceeding in advance.
C.A.G. initially received the surname of T.. On June 25, 2021, Ms. C. had C.A.G.'s surname changed to G. and a new birth certificate was created. C.A.G. was 4 ½ years old at that point.
While Ms. C. was pregnant with C.A.G., the parties had another Family Court matter which resulted in a default Order granting Mr. T. custody of the parties other two children.
Mr. T. testified that he used to have a relationship with C.A.G., however he last had contact with her quite some time ago. On direct, he testified he last saw her in July, 2022, however on cross-examination, he admitted he hasn't seen C.A.G. since July, 2020. Mr. T. would like more contact with C.A.G., but he doesn't have a good relationship with Ms. C., so he would need an order of parentage in order to petition for access.
Mr. T. admits he has not paid child support for C.A.G.. He testified he is willing to pay support, but would need to have the DNA test first to determine if he is in fact the biological parent. He is worried that if years in the future, it is determined that he is the biological father, Ms. C. could seek back child support from him. This happened to his father.
Mr. T. testified that if he is C.A.G.'s biological father, then C.A.G. should know he is, it would be devastating to her not to know.
Mr. T. testified that his relationship with Ms. C. was not good, they had a violent and [*3]abusive history. He understands Ms. C.'s concerns that the older two children witnessed that abuse and that she wants to protect C.A.G. from it, but he might be her father.
Mr. T. has a criminal history. A number of certificates of convictions were stipulated into the record. Additionally, the Court is able to draw a negative inferences from Mr. T. "pleading the 5th" to questions about his assaults of Ms. C., convictions for criminal contempt, being sent to jail for assaults on Ms. C., serving federal prison time, violating parole requiring him to be sent back to federal prison and currently pending criminal charges among others. See e.g., El-Dehdan v El-Dehdan, 26 NY3d 19 (2015).
Respondent, C.C. testified. She is the mother of C.A.G.. Ms. C. admitted that Mr. T. was present for C.A.G.'s birth, although, she testified, he was "sleeping and hungover".
Ms. C. testified that originally, she agreed to give C.A.G. Mr. T.'s surname, because she was too scared to tell him that she had had an affair. In the past, Mr. T. threatened to and almost did kill her numerous times.
Ms. C. testified that she allowed Mr. T. to get custody of the parties other two children by default because she was recovering from, and needed time to heal from his physical and emotional abuse, so she did not appear in court. Ms. C. testified that during their relationship, when they would argue, Mr. T. would block her exit to prevent her from leaving. Ms. C. took to locking herself in the bathroom and cutting her wrists. She testified she had been "in a bad place". Later, she sought counseling and prescriptive medication. She did not get an Order of access until 2022. Prior to that, she could only see the children under Mr. T.'s conditions. Even now with the Court Order, her access depends on Mr. T.'s mood, she testified.
Ms. C. testified that Mr. J.G. is C.A.G.'s father. She first slept with Mr. G. in 2016, from approximately November through August. They stopped "talking" during her pregnancy, but after the parties broke up, she and Mr. G. resumed their relationship, and he moved in with her. They have another child together who lives in the home with C.A.G. and Ms. C..
Ms. C. filed a paternity petition to name Mr. G. as C.A.G.'s father and that case resulted in an Order of Filiation naming Mr. G. as her father. Subsequently, Ms. C. had the Birth Certificate amended to name him as parent on that document.
It is not disputed that C.A.G. believes Mr. G. is her father and has never known anyone else to be her father. C.A.G. calls Mr. G. "daddy".
Mr. G. acted as a father in every way, taking care of C.A.G.'s needs, he took her to doctor appointments, on outings, made her dinner, bought her clothes and toys, and generally participated as part of the family unit. Various photographs in evidence show C.A.G. with Mr. G., or the two of them with Ms. C. and the other child she has with Mr. G.. One picture shows Mr. G. walking C.A.G. into the water because she was scared and the water was cold. They had gone to Beaver Island for the day to celebrate C.A.G.'s birthday in July, 2018. Another shows how Mr. G. would FaceTime C.A.G. from his workplace, which Ms. C. testified he did on a regular basis. 
A drawing made by C.A.G. about 6 months ago depicts her family which includes herself, Ms. C., Mr. G. and her siblings.
It is not disputed that C.A.G. and Mr. G. had a loving relationship, they hugged, they played. Mr. G. affectionately referred to C.A.G. as "my little G.". Sadly, Mr. G. passed away December 16, 2019 of natural causes. Mr. G. resided with Ms. C. and C.A.G. until his death. C.A.G. has a photograph of Mr. G. that she carries in her school bookbag and has another taped beside her bed. She says good night to him every night. C.A.G. has told Ms. C. that "Daddy's in [*4]the sky because he's in heaven and that's where heaven is".
Ms. C. has re-married a man named J. C.; C.A.G. calls him "Big Daddy". They have a close relationship, and he provides emotional support. However, C.A.G. knows he is not her father, he is a "bonus dad".
Mr. T. testified he tried to give C.A.G. a Christmas gift in 2021 but Ms. C. would not allow it. Ms. C. testified that Mr. T. called her in December, 2021 and wanted to bring over gifts that day. Ms. C. said it was not a good time as she was leaving for a party. Ms. C. testified that Mr. T. became irate and threatened that she would never again see her other two children whom he had in his care.
In 2010, Ms. C. left the home to borrow sugar from a neighbor, leaving the oven on and a fire started. She was 19 years old. Ms. C. testified she would not do that today.
Ms. C. admitted that the school called her indicating one of the children had an inappropriate picture on her cell phone. Ms. C. had provided that cell phone and Ms. C. took the phone away.
C.A.G. is a healthy eater, her favorite foods are strawberries and grapes according to Ms. C.. She is a self-soother and can calm herself if she has a bad dream.
An in camera was not requested and was determined not necessary under the circumstances, particularly as there is no dispute that Mr. G. was held out to be C.A.G.'s father, that he acted in a parental capacity and that C.A.G. believes him to be her father.
Conclusions of Law
The question the Court must determine is whether it is in the best interests of C.A.G. to order genetic marker tests or whether Mr. T. should be precluded from pursuing any change to parental status.
Where paternity is contested, Family Court Act 418 and 532 provide the Court with authority to order the mother, the child and the alleged father to submit to one or more genetic marker tests (DNA) tests. No such test shall be ordered however upon a written decision by the court that it is not in the best interests of the child on the basis of equitable estoppel.
The purpose of equitable estoppel is to preclude a person from asserting a right when he or she has led another to form the reasonable belief that the right would not be asserted, and loss or prejudice to the other would result if the right were asserted. Where a child justifiably relies on the representations that a specific man is his/her father with the result that he/she will be harmed by the man's denial of paternity, equitable estoppel may be invoked. Shondel J. v Mark D., 7 NY3d 320 (2006). Equitable estoppel may be invoked either offensively or defensively, to prevent someone from denying paternity or from establishing it. Juanita A. v Kenneth Mark N, 15 NY3d 1 (2010). The courts impose equitable estoppel to protect the status interests of a child in an already recognized and operative parent-child relationship. Shondel J v Mark D, supra. In applying the doctrine of equitable estoppel, the child's best interests are paramount. Jonathan C v Iaishia QT, 131 AD3d 1054 (2d Dept., 2015). 
The doctrine of equitable estoppel requires the court to first look to the elements of representation, reliance, and detriment. The party raising equitable estoppel issues has the initial burden to establish a prima facie case sufficient to support that claim. If these are shown, the burden then shifts to the opposing party to demonstrate why estoppel should not be applied. Sharon GG v Duane HH., 63 NY2d 859 (1984); Debra H v Janice R., 14 NY3d 576 (2010); Edward WW v Diana XX, 79 AD3d 1181 (3d Dept., 2010).
Here, Ms. C. and Mr. G. held Mr. G. out as C.A.G.'s father throughout her life, consistently representing to C.A.G. that Mr. G. was her father. Mr. G. is the only father C.A.G. has ever known. Mr. G. lived with C.A.G. during his lifetime, had a close, loving relationship with her and he fulfilled the traditional duties of a parent. This is not a situation where the established father failed to carry out the traditional responsibilities of a parent, see, e.g., Starla D v Jeremy E., 95 AD3d 1605 (3rd Dept., 2012); rather, Mr. G. acted as a father in every way. Mr. G. also consented to an Order of Filiation being entered naming him father of C.A.G..
Ms. C. and Mr. G. consistently represented to C.A.G. that Mr. G. was her father and C.A.G. relied upon that representation in the development of her relationship with Mr. G. such that it would be to her detriment to now jeopardize and potentially lose that relationship by ordering DNA testing. See, e.g., Bruce WL v Carol AP., 46 AD3d 1471 (4th Dept., 2007); Elizabeth S v Julio J, 20 NY3d 995 (2013). Although Mr. G. is deceased, C.A.G.'s relationship with him continues, as anyone who has lost a parent realizes. Matter of C.H. v S.F., 67 Misc 3d 1231(A) (Erie Co Family Ct, 2018).
Mr. T. knew that Ms. C. was pregnant and was physically present at C.A.G.'s birth. He admitted that he had doubts at that time of his paternity and therefore refused to sign the Acknowledgement of Paternity at the hospital. Yet, he took no timely steps to establish his paternity. Although Mr. T. blames his inability to seek Paternity testing on Ms. C. having moved out of town, the parties were involved in custody proceedings with respect to their other children for the ensuing year or two following their separation. Mr. T. could easily have sought genetic marker testing at that time but failed to do so. Contrary to Mr. T.'s testimony, his prior paternity petitions were both dismissed for his own failure to appear in court. Except for one attempt to send C.A.G. a Christmas gift in 2022, Mr. T. provided no child support, no gifts or cards for C.A.G.'s birthday or other Christmases. He made no efforts to seek access with or spend time with C.A.G.. Meantime, Mr. G. was actively living with and raising C.A.G.. Where a potential bio-father fails to form a bond with the child, delays taking steps to establish his paternity while another person has fulfilled the father role for the child, he may be estopped from asserting his claim. See, e.g., Darnell JP v Lianna YP, 150 AD3d 406 (1st Dept., 2017); Thomas T. v Luba R., 148 AD3d 912 (2d Dept., 2017).
Respondent has met her initial burden and the burden therefore shifts to the Petitioner.
Petitioner argues that estoppel should not be applied because it is not in C.A.G.'s best interests. He argues C.A.G. should know who her biological father is, and that if it is determined to be himself, Mr. T. would provide child support. Mr. T. provided no other reason why it would be in C.A.G.'s best interests to conduct the testing. In fact, Mr. T. seemed most concerned that he might in the future be responsible for large amounts of retroactive support if he was later determined to be the father.
There is evidence to suggest it would not be in C.A.G.'s best interests for Mr. T. to be determined the father. Ms. C. testified that Mr. T. had emotionally and physically abused her for years and Mr. T. admitted that his relationship with Ms. C. had been violent. Further, Mr. T. has a significant criminal history criminal history, which includes violating court orders, controlled substances and weapons.
The Court must weigh the child's right to know her biological father against any psychological harm or trauma caused by a disruption of the already existent parent-child relationship. Purificati v Paricos, 154 AD2d 360 (2d Dept., 1989). While there may be no bar to genetic testing when there is an absence of a parent-child bond, see e.g., Patrick A v Rochelle B, [*5]135 AD3d 1025 (3d Dept., 2016), where it would be detrimental to the child's interests to disrupt the child's close relationship with an established father figure, equitable estoppel should be applied., Juanita A v Kenneth Mark N, supra. Here, a strong and permanent father-daughter bond has formed between C.A.G. and Mr. G. which clearly rises to the level of a "recognized and operative parent-child relationship". See, e.g., Tianna R v Timothy C, 114 AD3d 860 (2d Dept., 2014). C.A.G. is not an infant. She has an undisputed knowledge of who her family is, including that Mr. G. is her father. Although the truth is important, the child also has a powerful interest in maintaining her relationship with the man whom she has always known as her father. Jennifer L v Gerald S., 145 AD3d 1581 (4th Dept., 2016). This is true even where the known father is deceased. C.H. v S.F and T.L., supra.
The Court need not consider the equities between the adult parties or other involved persons as the case turns exclusively on the best interests of the child; Tanesha H. v Philip C., 57 AD3d 403 (1st Dept., 2008); and it is the child's interests that are paramount. Sarah S v James T., 299 AD2d 785 (3d Dept., 2002). Thus, although Mr. T. might think it unfair, his rights or positions are immaterial to the ultimate issue of C.A.G.'s best interests.
As the Court of Appeals aptly stated in Shondel J. v Mark D., supra, "situations vary, and the question of whether extinguishing the relationship and its attendant obligations will disserve the child is one for Family Court based on the facts in each case." Under the circumstances outlined herein, it is in C.A.G.'s best interests to estop Mr. T. from disputing paternity. DSS v Donald A.C., 179 AD3d 603 (1st Dept., 2020); Shawn H. v Kimberly F., 115 AD3d 744 (2d Dept., 2014).
NOW, THEREFORE, it is hereby
ORDERED, that both the Respondent's and the Attorney for the Child's Motions to Dismiss is hereby granted; and it is further
ORDERED, that the Paternity Petition filed by Mr. T. is hereby dismissed with prejudice.
April 3, 2024
Hon. Brenda M. Freedman, JFC