L.T. v C.C. (2024 NY Slip Op 50359(U))

[*1]

L.T. v C.C.

2024 NY Slip Op 50359(U) [82 Misc 3d 1221(A)]

Decided on April 3, 2024

Family Court, Erie County

Freedman, J.

Published by New York State Law Reporting
Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be
published in the printed Official Reports.

Decided on April 3, 2024
Family Court, Erie County

L.T.,
Petitioner,

against
C.C., Respondent.

Docket No. P-13833-22

L.T., Pro se
MICHAEL H. RANZENHOFER, ESQ.
Attorney for
C.C.
CHERYL A. BERZER, ESQ.
Attorney for the Child, C. A. G.

Brenda M. Freedman, J.

Petitioner, L. T. ["Mr. T."] filed a Petition to establish Paternity on December 29,
2022 against Respondent, C. C. ["Ms. C."] with respect to the child, C.A.G., born XX
XX, 2017. Respondent moved to dismiss the Petition on the basis of Equitable Estoppel.
By separate motion, the Attorney for the Child also moved to dismiss the Petition on the
basis of Equitable Estoppel. Both Motions were granted to the extent that a Hearing was
scheduled. The Hearing was held on December 1, 2023 and January 26, 2024. The Court
heard from the following witnesses: Ms. P. B., Petitioner's mother; Mr. L. T., Petitioner,
and C. C., Respondent-mother. A number of documents were introduced into evidence.
An In camera was not held in this case.
Now, upon all the pleadings and proceedings held herein and upon the Court's
unique opportunity to observe and evaluate each witness, to review the pertinent statutes
and case law and apply it to the evidence adduced at the Hearing, I render the following
Findings of Fact and Conclusions of Law, Decision and Order:
C.A.G. was born XX XX, 2017. Ms. C. is her natural mother. The parties stipulate
that Mr. T. was present at C.A.G.'s birth.
An Order of Filiation was entered naming Mr. J.G. the father of C.A.G. dated
August 28, 2019.
It is undisputed that the parties were together as a couple for approximately 10 years
and have two other children together who are approximately 10 and 12 years old.
Ms. P. B., Petitioner's mother testified. Although she recalls the birth of C.A.G., and
that it was at Buffalo General Hospital, she did not remember the birthdate. However, her
son, Mr. T. [*2]showed her photographs of the birth. She
has interacted with C.A.G. approximately 15 times, mainly at her home. At one point,
Ms. C. had to be hospitalized and she arranged for Ms. B. to watch all of the children,
including C.A.G., for approximately 1 week. Mr. T. was present and interacted well with
C.A.G.. However, the last time she saw C.A.G. was approximately 2 years ago when she
was 4 years old. While Ms. C. was pregnant and after the birth, Ms. B. had discussed
with Ms. C. that Mr. T. was C.A.G.'s father and Ms. C. never denied it until the parties
separated.
Mr. L.T. testified. The parties were in a relationship in 2017 when C.A.G. was
conceived and born. Mr. T. testified the parties had sexual intercourse throughout their
relationship including during the period of conception. Mr. T. gave conflicted testimony
about when the parties broke up. First, he said they were together until August or
September 2018, but later testified they broke up in 2017 after C.A.G.'s birth. Either way,
they had been together for about 10 years and had 2 prior born children together. Mr. T.
admitted they had a rocky relationship, breaking up numerous times. The last time they
broke up, he moved out. Mr. G., who Ms. C. claims is C.A.G.'s father, did not "come into
the picture" until 2018, a year after C.A.G. was born, according to Mr. T.
Mr. T. has had doubts about his parentage and has tried in the past to get a DNA test.
Mr. T. testified that Ms. C. left Erie County twice making it impossible for him to serve
her with his paternity petitions. He filed a paternity petition in March, 2018 which
resulted in a dismissal. Although Mr. T. testified Ms. C. failed to appear, in fact, it was
Mr. T. who failed to appear and the matter was dismissed as a result of his failure to
prosecute. Mr. T. admits he did not file any paternity petitions in 2019, 2020 or 2021. He
did file in 2022 and that matter was dismissed because he was ill and could not make it to
court, Mr. T. testified.
Mr. T. refused to sign the Acknowledgement of Paternity because, he testified, he
was not sure the baby was his.
On August 28, 2019, the day the Order of Filiation was entered naming Mr. G. father
of C.A.G., Mr. T. was present in the Courthouse on a different matter and he saw Ms. C.
and Mr. G. come out of a courtroom. He testified had not known of that court proceeding
in advance.
C.A.G. initially received the surname of T.. On June 25, 2021, Ms. C. had C.A.G.'s
surname changed to G. and a new birth certificate was created. C.A.G. was 4 ½
years old at that point.
While Ms. C. was pregnant with C.A.G., the parties had another Family Court matter
which resulted in a default Order granting Mr. T. custody of the parties other two
children.
Mr. T. testified that he used to have a relationship with C.A.G., however he last had
contact with her quite some time ago. On direct, he testified he last saw her in July, 2022,
however on cross-examination, he admitted he hasn't seen C.A.G. since July, 2020. Mr.
T. would like more contact with C.A.G., but he doesn't have a good relationship with Ms.
C., so he would need an order of parentage in order to petition for access.
Mr. T. admits he has not paid child support for C.A.G.. He testified he is willing to
pay support, but would need to have the DNA test first to determine if he is in fact the
biological parent. He is worried that if years in the future, it is determined that he is the
biological father, Ms. C. could seek back child support from him. This happened to his
father.
Mr. T. testified that if he is C.A.G.'s biological father, then C.A.G. should know he
is, it would be devastating to her not to know.
Mr. T. testified that his relationship with Ms. C. was not good, they had a violent and
[*3]abusive history. He understands Ms. C.'s concerns
that the older two children witnessed that abuse and that she wants to protect C.A.G.
from it, but he might be her father.
Mr. T. has a criminal history. A number of certificates of convictions were stipulated
into the record. Additionally, the Court is able to draw a negative inferences from Mr. T.
"pleading the 5th" to questions about his assaults of Ms. C., convictions for criminal
contempt, being sent to jail for assaults on Ms. C., serving federal prison time, violating
parole requiring him to be sent back to federal prison and currently pending criminal
charges among others. See e.g., El-Dehdan v El-Dehdan, 26 NY3d 19
(2015).
Respondent, C.C. testified. She is the mother of C.A.G.. Ms. C. admitted that Mr. T.
was present for C.A.G.'s birth, although, she testified, he was "sleeping and
hungover".
Ms. C. testified that originally, she agreed to give C.A.G. Mr. T.'s surname, because
she was too scared to tell him that she had had an affair. In the past, Mr. T. threatened to
and almost did kill her numerous times.
Ms. C. testified that she allowed Mr. T. to get custody of the parties other two
children by default because she was recovering from, and needed time to heal from his
physical and emotional abuse, so she did not appear in court. Ms. C. testified that during
their relationship, when they would argue, Mr. T. would block her exit to prevent her
from leaving. Ms. C. took to locking herself in the bathroom and cutting her wrists. She
testified she had been "in a bad place". Later, she sought counseling and prescriptive
medication. She did not get an Order of access until 2022. Prior to that, she could only
see the children under Mr. T.'s conditions. Even now with the Court Order, her access
depends on Mr. T.'s mood, she testified.
Ms. C. testified that Mr. J.G. is C.A.G.'s father. She first slept with Mr. G. in 2016,
from approximately November through August. They stopped "talking" during her
pregnancy, but after the parties broke up, she and Mr. G. resumed their relationship, and
he moved in with her. They have another child together who lives in the home with
C.A.G. and Ms. C..
Ms. C. filed a paternity petition to name Mr. G. as C.A.G.'s father and that case
resulted in an Order of Filiation naming Mr. G. as her father. Subsequently, Ms. C. had
the Birth Certificate amended to name him as parent on that document.
It is not disputed that C.A.G. believes Mr. G. is her father and has never known
anyone else to be her father. C.A.G. calls Mr. G. "daddy".
Mr. G. acted as a father in every way, taking care of C.A.G.'s needs, he took her to
doctor appointments, on outings, made her dinner, bought her clothes and toys, and
generally participated as part of the family unit. Various photographs in evidence show
C.A.G. with Mr. G., or the two of them with Ms. C. and the other child she has with Mr.
G.. One picture shows Mr. G. walking C.A.G. into the water because she was scared and
the water was cold. They had gone to Beaver Island for the day to celebrate C.A.G.'s
birthday in July, 2018. Another shows how Mr. G. would FaceTime C.A.G. from his
workplace, which Ms. C. testified he did on a regular basis. 
A drawing made by C.A.G. about 6 months ago depicts her family which includes
herself, Ms. C., Mr. G. and her siblings.
It is not disputed that C.A.G. and Mr. G. had a loving relationship, they hugged, they
played. Mr. G. affectionately referred to C.A.G. as "my little G.". Sadly, Mr. G. passed
away December 16, 2019 of natural causes. Mr. G. resided with Ms. C. and C.A.G. until
his death. C.A.G. has a photograph of Mr. G. that she carries in her school bookbag and
has another taped beside her bed. She says good night to him every night. C.A.G. has
told Ms. C. that "Daddy's in [*4]the sky because he's in
heaven and that's where heaven is".
Ms. C. has re-married a man named J. C.; C.A.G. calls him "Big Daddy". They have
a close relationship, and he provides emotional support. However, C.A.G. knows he is
not her father, he is a "bonus dad".
Mr. T. testified he tried to give C.A.G. a Christmas gift in 2021 but Ms. C. would not
allow it. Ms. C. testified that Mr. T. called her in December, 2021 and wanted to bring
over gifts that day. Ms. C. said it was not a good time as she was leaving for a party. Ms.
C. testified that Mr. T. became irate and threatened that she would never again see her
other two children whom he had in his care.
In 2010, Ms. C. left the home to borrow sugar from a neighbor, leaving the oven on
and a fire started. She was 19 years old. Ms. C. testified she would not do that today.
Ms. C. admitted that the school called her indicating one of the children had an
inappropriate picture on her cell phone. Ms. C. had provided that cell phone and Ms. C.
took the phone away.
C.A.G. is a healthy eater, her favorite foods are strawberries and grapes according to
Ms. C.. She is a self-soother and can calm herself if she has a bad dream.
An in camera was not requested and was determined not necessary under the
circumstances, particularly as there is no dispute that Mr. G. was held out to be C.A.G.'s
father, that he acted in a parental capacity and that C.A.G. believes him to be her
father.
Conclusions of Law
The
question the Court must determine is whether it is in the best interests of C.A.G. to order
genetic marker tests or whether Mr. T. should be precluded from pursuing any change to
parental status.
Where paternity is contested, Family Court Act 418 and 532 provide the Court with
authority to order the mother, the child and the alleged father to submit to one or more
genetic marker tests (DNA) tests. No such test shall be ordered however upon a written
decision by the court that it is not in the best interests of the child on the basis of
equitable estoppel.
The purpose of equitable estoppel is to preclude a person from asserting a right when
he or she has led another to form the reasonable belief that the right would not be
asserted, and loss or prejudice to the other would result if the right were asserted. Where
a child justifiably relies on the representations that a specific man is his/her father with
the result that he/she will be harmed by the man's denial of paternity, equitable estoppel
may be invoked. Shondel J. v
Mark D., 7 NY3d 320 (2006). Equitable estoppel may be invoked either
offensively or defensively, to prevent someone from denying paternity or from
establishing it. Juanita A. v
Kenneth Mark N, 15 NY3d 1 (2010). The courts impose equitable estoppel to
protect the status interests of a child in an already recognized and operative parent-child
relationship. Shondel J v Mark D, supra. In applying the doctrine of
equitable estoppel, the child's best interests are paramount. Jonathan C v Iaishia QT, 131
AD3d 1054 (2d Dept., 2015). 
The doctrine of equitable estoppel requires the court to first look to the elements of
representation, reliance, and detriment. The party raising equitable estoppel issues has the
initial burden to establish a prima facie case sufficient to support that claim. If these are
shown, the burden then shifts to the opposing party to demonstrate why estoppel should
not be applied. Sharon GG v Duane HH., 63 NY2d 859 (1984); Debra H v Janice R., 14 NY3d
576 (2010); Edward WW v
Diana XX, 79 AD3d 1181 (3d Dept., 2010).
Here, Ms. C. and Mr. G. held Mr. G. out as C.A.G.'s father throughout her life,
consistently representing to C.A.G. that Mr. G. was her father. Mr. G. is the only father
C.A.G. has ever known. Mr. G. lived with C.A.G. during his lifetime, had a close, loving
relationship with her and he fulfilled the traditional duties of a parent. This is not a
situation where the established father failed to carry out the traditional responsibilities of
a parent, see, e.g., Starla D v
Jeremy E., 95 AD3d 1605 (3rd Dept., 2012); rather, Mr. G. acted as a father in
every way. Mr. G. also consented to an Order of Filiation being entered naming him
father of C.A.G..
Ms. C. and Mr. G. consistently represented to C.A.G. that Mr. G. was her father and
C.A.G. relied upon that representation in the development of her relationship with Mr. G.
such that it would be to her detriment to now jeopardize and potentially lose that
relationship by ordering DNA testing. See, e.g., Bruce WL v Carol AP., 46 AD3d 1471 (4th
Dept., 2007); Elizabeth S v Julio J, 20 NY3d 995 (2013). Although Mr. G. is
deceased, C.A.G.'s relationship with him continues, as anyone who has lost a parent
realizes. Matter of C.H. v
S.F., 67 Misc 3d 1231(A) (Erie Co Family Ct, 2018).
Mr. T. knew that Ms. C. was pregnant and was physically present at C.A.G.'s birth.
He admitted that he had doubts at that time of his paternity and therefore refused to sign
the Acknowledgement of Paternity at the hospital. Yet, he took no timely steps to
establish his paternity. Although Mr. T. blames his inability to seek Paternity testing on
Ms. C. having moved out of town, the parties were involved in custody proceedings with
respect to their other children for the ensuing year or two following their separation. Mr.
T. could easily have sought genetic marker testing at that time but failed to do so.
Contrary to Mr. T.'s testimony, his prior paternity petitions were both dismissed for his
own failure to appear in court. Except for one attempt to send C.A.G. a Christmas gift in
2022, Mr. T. provided no child support, no gifts or cards for C.A.G.'s birthday or other
Christmases. He made no efforts to seek access with or spend time with C.A.G..
Meantime, Mr. G. was actively living with and raising C.A.G.. Where a potential
bio-father fails to form a bond with the child, delays taking steps to establish his paternity
while another person has fulfilled the father role for the child, he may be estopped from
asserting his claim. See, e.g., Darnell JP v Lianna YP, 150 AD3d 406 (1st Dept.,
2017); Thomas T. v Luba
R., 148 AD3d 912 (2d Dept., 2017).
Respondent has met her initial burden and the burden therefore shifts to the
Petitioner.
Petitioner argues that estoppel should not be applied because it is not in C.A.G.'s best
interests. He argues C.A.G. should know who her biological father is, and that if it is
determined to be himself, Mr. T. would provide child support. Mr. T. provided no other
reason why it would be in C.A.G.'s best interests to conduct the testing. In fact, Mr. T.
seemed most concerned that he might in the future be responsible for large amounts of
retroactive support if he was later determined to be the father.
There is evidence to suggest it would not be in C.A.G.'s best interests for Mr. T. to
be determined the father. Ms. C. testified that Mr. T. had emotionally and physically
abused her for years and Mr. T. admitted that his relationship with Ms. C. had been
violent. Further, Mr. T. has a significant criminal history criminal history, which includes
violating court orders, controlled substances and weapons.
The Court must weigh the child's right to know her biological father against any
psychological harm or trauma caused by a disruption of the already existent parent-child
relationship. Purificati v Paricos, 154 AD2d 360 (2d Dept., 1989). While there
may be no bar to genetic testing when there is an absence of a parent-child bond, see
e.g., Patrick A v Rochelle B, [*5]135 AD3d 1025 (3d
Dept., 2016), where it would be detrimental to the child's interests to disrupt the child's
close relationship with an established father figure, equitable estoppel should be applied.,
Juanita A v Kenneth Mark N, supra. Here, a strong and permanent
father-daughter bond has formed between C.A.G. and Mr. G. which clearly rises to the
level of a "recognized and operative parent-child relationship". See, e.g., Tianna R v
Timothy C, 114 AD3d 860 (2d Dept., 2014). C.A.G. is not an infant. She has an
undisputed knowledge of who her family is, including that Mr. G. is her father. Although
the truth is important, the child also has a powerful interest in maintaining her
relationship with the man whom she has always known as her father. Jennifer L v Gerald S., 145
AD3d 1581 (4th Dept., 2016). This is true even where the known father is deceased.
C.H. v S.F and T.L., supra.
The Court need not consider the equities between the adult parties or other involved
persons as the case turns exclusively on the best interests of the child; Tanesha H. v Philip C., 57
AD3d 403 (1st Dept., 2008); and it is the child's interests that are paramount.
Sarah S v James T., 299 AD2d 785 (3d Dept., 2002). Thus, although Mr. T.
might think it unfair, his rights or positions are immaterial to the ultimate issue of
C.A.G.'s best interests.
As the Court of Appeals aptly stated in Shondel J. v Mark D., supra,
"situations vary, and the question of whether extinguishing the relationship and its
attendant obligations will disserve the child is one for Family Court based on the facts in
each case." Under the circumstances outlined herein, it is in C.A.G.'s best interests to
estop Mr. T. from disputing paternity. DSS v Donald A.C., 179 AD3d 603 (1st Dept., 2020); Shawn H. v Kimberly F., 115
AD3d 744 (2d Dept., 2014).
NOW, THEREFORE, it is hereby
ORDERED, that both the Respondent's and the Attorney for the Child's
Motions to Dismiss is hereby granted; and it is further
ORDERED, that the Paternity Petition filed by Mr. T. is hereby dismissed
with prejudice.
April 3, 2024
Hon. Brenda M. Freedman, JFC